# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00262-CR

---

**Gary Lynn Denson, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 19-1371-K26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Gary Lynn Denson was convicted by a jury of indecency with a child by sexual contact—enhanced by a prior conviction for the same offense—and sentenced by the trial court to statutorily-mandated life imprisonment. *See* Tex. Penal Code §§ 21.11 (codifying offense of indecency with child), 12.42(c)(2)(B)(ii) (providing that defendant convicted of indecency with child by sexual contact "shall be punished by imprisonment in the Texas Department of Criminal Justice for life" if previously convicted of offense under Section 21.11). In a single issue on appeal, Denson contends that the trial court erred by admitting extraneous-offense evidence in violation of Texas Rule of Evidence 403. *See* Tex. R. Evid. 403 (allowing trial court to exclude relevant evidence if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue

delay, or needlessly presenting cumulative evidence"). We will affirm the trial court's judgment of conviction.

## BACKGROUND

Denson was charged by indictment with indecency with a child, C.W.,[1] by sexual contact. At trial, the State called a fingerprint-identification expert; a sexual assault nurse examiner (SANE); C.W.'s sister, M.A.; a forensic interviewer; Georgetown Police Department Detective Ruben Vasquez; C.W.'s caretaker, Beverly Bratton; and C.W. as witnesses. The State's exhibits included the indictment, judgment form, and Texas Department of Criminal Justice (TDCJ) records from Denson's 2008 conviction for indecency with a child by sexual contact; his TDCJ booking report and fingerprint card; and C.W.'s sexual assault forensic examination (SAFE) report. The defense called Denson's stepdaughter, Barbra Ellis, and wife, Melva, as witnesses and offered into evidence photographs of Denson's home.

Before trial, a hearing was held pursuant to Section 2-a of Article 38.37 of the Texas Code of Criminal Procedure on the admissibility of the extraneous-offense evidence. *See* Tex. Code Crim. Proc. art. 38.37, § 2-a(2) (requiring hearing before evidence can be admitted under Article 38.37 to determine if evidence likely to be admitted at trial "will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt"). The defense objected under Rule 403, arguing that the remoteness of the extraneous offense and the defense's inability to contextualize it would result in juror confusion and unfair prejudice. The trial court overruled the objection and admitted the evidence.

---

[1] Because the complainant is a minor, we will refer to her by her initials in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

At trial, the State's fingerprint-identification expert, Williamson County Sheriff's Office Deputy Colby Hughey, testified that she had fingerprinted Denson the morning of trial, that his thumbprint matched the defendant's thumbprint on the 2008 judgment form, and that it was her opinion that Denson was the same individual identified in the indictment, judgment form, and TDCJ records. She testified that the indictment for the 2008 conviction charged Denson with indecency with a child on August 16, 1998, in Williamson County. On cross-examination, she testified that she had not been involved in the investigation of the 1998 offense. She also testified that it appeared from the exhibits that Denson had been placed on probation in 1998 but that his probation had been revoked and his guilt adjudicated in 2008.

Rebecca Broussard, a SANE, testified that she conducted a SAFE of C.W. on May 9, 2019, when C.W. was 10 years old. She testified that C.W. identified Denson, who C.W. referred to as "Uncle Gary," as her assailant and stated that she was there because "her uncle has been touching her in inappropriate ways." Broussard testified that C.W. also stated that Denson had been "touching [her] vagina and [her] butt" over her clothing. Broussard testified that C.W. did not report being in pain but that she noticed generalized redness on C.W.'s genitalia, indicating that "something had irritated her in the past." Broussard also testified that although she asked C.W. about her sexual history, Broussard did not indicate an answer on her report. She testified that Bratton, who had brought C.W. to the appointment, told her that C.W. did not want to be around Denson. On cross-examination, Broussard testified that she had not collected samples for DNA testing because the alleged abuse had occurred more than five days prior, that she did not ask C.W. whether there had been other instances of abuse, and that C.W. had not volunteered any further instances.

3

M.A., who is approximately 16 years older than C.W., testified about the family's structure and dynamics. She took care of C.W. and their brother V.W. when they were younger because of their mother's unstable and transient lifestyle. C.W.'s father is the brother of Melva, Denson's wife; in other words, Denson is C.W.'s uncle-in-law. Prior to the alleged offense, C.W. and V.W. spent time at Denson's house "all the time, . . . mostly on the weekends" when their mother "would go over there and hang out." Approximately seven years before trial, M.A., C.W., V.W., and their mother moved into a farmhouse in Jarrell, Texas, with Rob Mills, their mother's ex-boyfriend. Beverly Bratton is a family friend who "became more family than friend." She was like a grandmother to C.W. and V.W. and would frequently take them on trips and care for them during holidays.

M.A. also testified about the outcry C.W. made to her during Easter week 2019. M.A., who had moved to West Virginia in 2017, was visiting C.W. and V.W. at the farmhouse. Their mother left for Louisiana on Wednesday night. On Thursday, M.A. took C.W. to the park, and C.W. asked her if she could tell her something. C.W. stated that Denson had been "touching" her and indicated that the touching had been to her vagina. M.A. testified that C.W. stated that the touching had occurred at the farmhouse and that Denson "wasn't just trying to be nice" or to put his hand on her leg. When asked if she had told their mother, C.W. stated that she had not because their mother "might not believe [her]"; C.W. had earlier lied about doing her homework and about their family owning RVs and boats: "just typical little kid lies."

M.A. told C.W. to tell their mother, but C.W. instead told a cousin. Nevertheless, the accusation was eventually relayed to their mother, who called M.A. and was very "aggressive" and upset with both M.A. and C.W. Their mother never came back from Louisiana, and M.A. returned to West Virginia without calling the police. On cross-examination, M.A.

4

testified that their mother had an alcohol problem and was very manipulative, that there was violence between their mother and C.W. and V.W.'s father, and that Bratton provided a "steadier, more enjoyable experience for" C.W. and V.W. M.A. testified that C.W. did not state that anything happened at Denson's house in her outcry. She also testified that, when making the outcry, C.W. looked at her, was a little hesitant, and did not discuss the alleged abuse in "very clinical terms."

Katherine Schroeder, formerly a forensic interviewer, testified that she interviewed C.W. on May 9, 2019. She testified that C.W. disclosed that she was sexually abused and that her disclosures were "consistent with what law enforcement had told [Schroeder] that [C.W.] said."

Detective Ruben Vasquez testified that he began investigating C.W.'s allegations after receiving a Child Protective Services (CPS) referral and that he scheduled both the SAFE and forensic interview. He testified that, as part of his investigation, he spoke with Bratton, the CPS investigator, Denson, and M.A. and reviewed the interview video, SAFE report, and medical records. He also testified that the evidence he discovered through his investigation was "consistent with [his] understanding of the outcry of sexual abuse" by C.W. On cross-examination, he testified that he did not investigate the farmhouse, visit Denson's house, or speak with Melva, other residents of Denson's house, or C.W.'s mother.

Bratton testified that she lives with her husband, C.W., and V.W. She testified that she met C.W.'s mother when she was pregnant with C.W. and that she largely cared for C.W. until she was a year and a half old. She testified that Mills called her around Easter 2019 and that she "immediately" picked up C.W. and V.W. from the farmhouse. She testified that C.W. told her what had happened, that she called 911 and CPS, and that she took C.W. to her

5

forensic interview. She testified that C.W. and V.W. stayed with her following C.W.'s outcry but that their parents came to get them "a couple of months later." She testified that their mother then returned to Louisiana and that their father abandoned them four or five months later, after which they returned to live with her. She also testified that C.W. does not speak with her mom and has no contact with her father. She testified that, before the outcry, she would pick C.W. up from Denson's house "at least half the time," that C.W.'s father was there "for a long time," and that C.W.'s mother would be there "every time."

C.W., who was 12 years old at the time of trial, testified that she used to visit Denson and Melva at their house "[i]n between a little bit and a lot," sometimes with her mother or father, and that she and V.W. would sleep on the living room floor or in the bedroom across from Denson and Melva's room. She testified that although she couldn't remember exactly what she told M.A. at the park, she "knew that it wasn't right" and "didn't want it to happen anymore." She testified that she knew her mother would not believe her.

C.W. also testified about the alleged abuse. She could not remember a specific instance but testified that "one time it was out at the farm that [she] used to live at . . . and then other times it was at [Denson's] house." Denson would touch her in the living room, generally when she and V.W. were sleeping on the floor. He would touch her at night "[i]n her front private spot," which she uses to go to the restroom, "and [her] lower body." He would always touch her over her clothing. When drunk, he would also try to force her to kiss him on the lips, and at least once when she was watching TV with his grandchildren and V.W.

She testified that after she told M.A. about the abuse, they went to the farmhouse where C.W. was picked up by Bratton. She testified that she and V.W. then went to live with their father, but he abandoned them, and they were again taken to live with Bratton. On

6

cross-examination, she testified that Melva's daughter, Barbra Ellis, lived with Denson and Melva; that the living room was next to the back door, kitchen, and bedroom hallway; and that she heard her mother call her a "little liar" on a phone call between her mother and Bratton.

Ellis testified that she considers Denson to be her father and that she and three of her sons live in Denson's house. She testified that when children visited the house, they would stay in the back bedroom with their parents but that sometimes kids would fall asleep in the living room on movie nights. She testified that during Easter weekend 2019, C.W. and V.W. were visiting, and C.W.'s mother was "missing." She testified that she thought of C.W. as a niece and that C.W., despite feeling comfortable confiding in her, never reported being afraid of Denson nor anything sexual or inappropriate happening to her.

Ellis also testified about C.W.'s and Denson's relationship. She never observed anything inappropriate between Denson and any child in the house, including C.W. She likewise never observed anything inappropriate between Denson and a child at the farmhouse in Jarrell. She never saw Denson lavishing any extra attention on C.W., seeking to be alone with her, separating her from the other children, being overly physical or demonstrative with her, or disciplining her differently. Ellis testified that she does not believe C.W. to be truthful.

On cross-examination, Ellis testified that Denson is her father as far as she is concerned, that she loves him, and that she does not want anything bad to happen to him. She testified that she slept in a different part of the house from C.W. and V.W. but that their parents were usually with them. She testified that C.W. and V.W. only slept in the living room if they fell asleep during a movie, in which case they would be moved to a bedroom. She also testified that she has been aware of Denson's prior conviction for indecency with a child since she was

12 years old but had still chosen to live in his house with her three young children. On redirect, she testified that she would not lie for Denson and that no one spoke with her about the case.

Melva testified that she had been married to Denson for nine years and that Ellis and her three children live with them "on a permanent basis." She testified that C.W. and V.W. last visited her house the day before Easter 2019; that they would sleep in the living room on a pallet, the couch, or a recliner; and that, at night, "usually by at least 11 o'clock all the kids were laying down" in the living room. She testified that the adults would gather at night in the garage, which is about 12 to 14 steps from the living room and from which they could hear "what was happening in [the] whole house" because the door between the garage and kitchen would be left open. She testified that C.W. and V.W. would go to sleep before the adults, that the adults all went to sleep around the same time, that Denson was never alone with the children in the house, and that she was aware that he had previously been "charged with" indecency.

Like Ellis, Melva testified about C.W.'s and Denson's relationship, observing that she never saw Denson pay inappropriate attention to C.W. or another child, be overly physical with C.W., try to isolate or spend time alone with C.W., or give C.W. special treatment or punishment. She testified that C.W. and Denson did not have a particularly "close bond" and that none of the children seemed afraid of Denson or reported inappropriate physical contact. She likewise testified that, when they were at the farmhouse, Denson did not spend time with the children and instead played cards inside with the other adults.

On cross-examination, she testified that she knew Denson's history but wanted to give him a second chance. After being read the indictment for the 1998 offense, she testified that she was aware of the allegations, that J.D.—the child whom Denson had been charged with abusing—was his son, and that she understood that "that's basically the same thing he's charged

8

with in this case involving [C.W.]" She also testified that she had not been "around for [the previous conviction]," had not "participate[d] in that process," and had only obtained information about it from Denson, his family, and J.D.

She testified that she loves Denson, that she does not want him to get into trouble, and that she wants him to come back home to her. She testified that she does not know exactly what C.W. alleged and that she could "somewhat" understand why C.W. would not confide in her. Regarding Denson's movements at night, she testified that she would know if someone got up at night because she is a light sleeper, that Denson would get up to use the bathroom, that he did not go to the kitchen to her knowledge, but that she "do[es]n't know exactly everything" and would agree that there are things that could happen in the house of which she may not be aware. Lastly, she testified that C.W. "gained something"—a stable home—by making the allegations against Denson and that she thinks that C.W. "was looking for better."

The jury found Denson guilty of indecency with a child by sexual contact. Following a hearing on punishment at which he pleaded true to the enhancement paragraph alleging a prior conviction for the 1998 offense, the trial court sentenced him to the statutorily-mandated term of life imprisonment. This appeal followed.

## DISCUSSION

In his sole issue on appeal, Denson contends that the trial court erred by admitting evidence of his prior conviction for indecency with a child by sexual contact in violation of Rule 403. Specifically, he argues that, although the evidence was probative, its remoteness and inherently prejudicial nature, as well as the defense's inability to "contextualize" the offense, rendered it inadmissible.

9

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Dabney v. State*, 492 S.W.3d 309, 316 (Tex. Crim. App. 2016). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). In other words, we may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see also Henley*, 493 S.W.3d at 83 ("Before a reviewing court may reverse the trial court's decision, 'it must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008))). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

Section 2(b) of Article 38.37 provides in relevant part that in a trial for indecency with a child by sexual contact, evidence of separate sexual offenses committed against a child other than the complainant is admissible "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." Tex. Code Crim. Proc. art. 38.37, §§ 1, 2; *Perez v. State*, 562 S.W.3d 676, 685 (Tex. App.—Fort Worth 2018, pet. ref'd). Although extraneous-offense evidence is admissible under Section 2(b) "[n]otwithstanding Rules 404 and 405" of the Texas Rules of Evidence, the trial court must still, upon proper objection or request, conduct a Rule 403 balancing test. *See Hitt v. State*, 53 S.W.3d 697, 706 (Tex. App.—Austin 2001, pet. ref'd); *Deggs v. State*,

10

646 S.W.3d 916, 925 (Tex. App.—Waco 2022, pet. ref'd) (citing *Price v. State*, 594 S.W.3d 674, 680 (Tex. App.—Texarkana 2019, no pet.)). Thus, the trial court may exclude otherwise admissible evidence if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

"Probative value" means more than relevance; rather, it "refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). "Unfair prejudice" refers to a "tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.*; *see Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). Under the Rule, trial courts have "considerable freedom in evaluating proffered evidence's probative value in relation to its prejudicial effect," and there should be "a corresponding reluctance on the part of an appellate court to reverse trial court decisions which admit or exclude evidence." *Montgomery*, 810 S.W.2d at 378.

In conducting a Rule 403 analysis, the trial court must balance the claimed probative force of the proffered evidence along with the proponent's need for the evidence against:

> (1) any tendency of the evidence to suggest that the case would be decided on an improper basis; (2) any tendency of the evidence to confuse or distract the jury

11

from the main issues; (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Henley*, 493 S.W.3d at 93 (citing *Gigliobianco*, 210 S.W.3d at 641–42). These factors may blend together in practice. *Gigliobianco*, 210 S.W.3d at 642.

**Inherent Probative Value**

Because evidence of prior sexual abuse of children is "'especially probative of [a defendant's] propensity to sexually assault children,' the Rule 403 balancing test normally will not favor the exclusion of evidence of the defendant's prior sexual assaults of children." *Alvarez v. State*, 491 S.W.3d 362, 371 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (quoting *Belcher v. State*, 474 S.W.3d 840, 848 (Tex. App.—Tyler 2015, no pet.)); *see Deggs*, 646 S.W.3d at 925 ("[E]vidence of a separate sexual offense against a child admitted under Article 38.37, Section 2(b) is probative of a defendant's character or propensity to commit sexual assaults on children."); *Caston v. State*, 549 S.W.3d 601, 612 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("[E]vidence that a defendant has sexually abused another child is relevant to whether the defendant sexually abused the child-complainant in the charged case.").

Denson argues that the probative value of evidence of his prior conviction is lessened by the conviction's "extreme remoteness" because it occurred approximately twenty years before the charged offense and twenty-two years before the underlying trial. We consider remoteness in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Harty v. State*, 552 S.W.3d 928, 935 (Tex. App.—Texarkana 2018, no pet.) (citing *Newton v. State*, 301 S.W.3d 315, 320 (Tex. App.—Waco 2009, pet. ref'd)). A substantial gap in time between the extraneous offense and the charged offense

will weaken the probative value of the extraneous-offense evidence "because, logically, the passage of time allows things and people to change." *Gaytan v. State*, 331 S.W.3d 218, 226–27 (Tex. App.—Austin 2011, pet. ref'd); *see Perez*, 562 S.W.3d at 690. However, remoteness is "but one aspect of an offense's probativeness" and alone "is not sufficient to render an extraneous offense excludable under Rule 403." *Gaytan*, 331 S.W.3d at 226–27. Moreover, similarities between the extraneous offense and charged offense may offset any loss of probative value resulting from the extraneous offense's remoteness. *See, e.g., Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet. ref'd) (concluding that although remoteness of extraneous offenses "undermined their probative value," trial court could have reasonably determined that "remarkable similarities" between extraneous offenses and charged offense "strengthened the probative value of the evidence," such that first factor was therefore "neutral" or "at most . . . somewhat favors exclusion" (quoting *Gaytan*, 331 S.W.3d at 227)).

As Denson acknowledges, "the prior offense for which he was charged and eventually convicted was the same as the present charge and involved similar facts." During the pretrial evidentiary hearing, defense counsel went further, arguing that the extraneous offense was "not just any old prior" but was "a prior for the exact same type [of] offense" and involved "the exact [same] scenario." Both indictments alleged that Denson touched the genitals of a child under 17 with the intent to arouse or satisfy his sexual desire. Both offenses allegedly occurred in Williamson County. And both complainants were children with whom Denson had a familial relationship. During the trial, Melva testified that she understood that the allegations in the 1998 indictment were "basically the same thing [Denson is] charged with in this case."

Although we have previously noted that time gaps of approximately 12 and 14 years between an extraneous offense and a charged offense "reduced the probative force of

13

the evidence of [the] extraneous offense[],'" we and our sister courts have also found similar, and longer, gaps to be offset by similarities between the two offenses. *Id.* at 219–20; *see also Newton*, 301 S.W.3d at 320 (determining that inherent probative value of remote but similar extraneous offense weighed "slightly in favor of admissibility" despite 25-year gap between extraneous offense and charged offense); *Gaytan*, 331 S.W.3d at 227 (finding that first *Gigliobianco* factor at most "somewhat" favored exclusion because although extraneous-offense testimony concerned "extremely remote events" occurring 24 and 28 years before charged offense, it was "remarkably similar" to complainant's, and trial court could have reasonably found that its inherent probative force was "significantly bolstered"); *Deggs*, 646 S.W.3d at 925 (finding that first factor weighed "strongly in favor of admission" even though extraneous offense allegedly occurred more than 20 years before trial); *Dies v. State*, 649 S.W.3d 273, 286 (Tex. App.—Dallas 2022, pet. ref'd) (finding that first factor weighed strongly in favor of admission and that extraneous-offense evidence was probative of defendant's character or propensity "to commit indecent acts with children around complainant's age" even though extraneous offense occurred approximately 19 years before trial and 12 years before abuse of complainant); *cf. Perez*, 562 S.W.3d at 690–91 (finding that similarities between extraneous offense and charged offense did not outweigh remoteness of extraneous-offense evidence and lack of intervening misconduct where extraneous offense occurred more than 50 years before trial). Thus, although Denson's prior conviction is extremely remote, and the State offered no evidence of intervening misconduct, the close similarities between that conviction and the charged offense lead us to conclude that the first factor is neutral or weighs at most somewhat in favor of exclusion. *See Robisheaux*, 483 S.W.3d at 220; *Gaytan*, 331 S.W.3d at 226–27.

14

**State's Need for the Evidence**

With respect to the second factor, Denson argues that the State's need for evidence of his prior conviction was low and that *Robisheaux*—a case on which the State relies to support its asserted need for the evidence—is distinguishable. The State responds that *Robisheaux* is similar and that it needed the extraneous-offense evidence to prove that Denson acted with the requisite intent and because the case largely amounted to Denson's word against C.W.'s.

In *Robisheaux*, we noted that defense counsel "repeatedly urged in his opening statement and in his cross-examination of [the complainant] that there was no physical evidence demonstrating that any sexual offense occurred and that her claims about sexual abuse were based on her 'testimony alone.'" 483 S.W.3d at 220. We also noted that in his cross-examination of the complainant, counsel insinuated that she may have fabricated the allegations by referencing her prior suicide attempt, her past mental-health treatment, and her marijuana use. *Id.* Lastly, we observed that although the State presented medical reports and other witnesses, that evidence merely repeated statements made by the complainant and that, therefore, without the extraneous-offense evidence, "'the State's case would have basically come down to' [the complainant's] word against Robisheaux's." *Id.* (quoting *Gaytan*, 331 S.W.3d at 227).

Denson contends that the present case is distinguishable because the State did not claim in its opening that the case would be a "swearing match"; defense counsel did not tell the jury that Denson had offered to take a polygraph or to submit to DNA testing; C.W. was 10 and made a spontaneous outcry whereas the complainant in *Robisheaux* was 14 and made an outcry in response to questioning; and C.W. testified about more than her initial outcry, alleging

15

additional details of the abuse and further bad acts by Denson. He concludes that C.W.'s credibility was therefore greater than the *Robisheaux* complainant's and that the State had less need of the extraneous-offense evidence.

Denson's reading of *Robisheaux* misconstrues the import of our analysis in that case. As we explained in *Robisheaux* when discussing a constitutional challenge to Section 2(b), there are important policy concerns that justify the admission of propensity evidence in child sexual abuse cases. *Id.* at 212. The Legislature has acknowledged that "because of the nature of child sex offenses, there is typically very little evidence to assist prosecutors with proving their cases," and "the primary piece of evidence in most child sexual abuse cases is a traumatized child." *Bradshaw v. State*, 466 S.W.3d 875, 884 (Tex. App.—Texarkana 2015, pet. ref'd) (quoting S. Comm. on Crim. Just., Bill Analysis, Tex. S.B. 12, 83d Leg., R.S. (2013)); *see Jenkins v. State*, 993 S.W.2d 133, 136 (Tex. App.—Tyler 1999, pet. ref'd) (stating that "[t]he special circumstances surrounding the sexual assault of a child victim outweigh normal concerns associated with evidence of extraneous acts"). The Court of Criminal Appeals elaborated in *Hammer v. State*:

> Trials involving sexual assault may raise particular evidentiary and constitutional concerns because the credibility of both the complainant and defendant is a central, often dispositive, issue. Sexual assault cases are frequently "he said, she said" trials in which the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, unaided by any physical, scientific, or other corroborative evidence. Thus, the Rules of Evidence, especially Rule 403, should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant in such "he said, she said" cases. And Texas law, as well as the federal constitution, requires great latitude when the evidence deals with a witness's specific bias, motive, or interest to testify in a particular fashion.

296 S.W.3d 555, 561–62 (Tex. Crim. App. 2009).

The present case is no exception. Similar to *Robisheaux*, the State's case here included almost no physical evidence. Besides Denson's prior conviction, the State focused solely on C.W.'s testimony and on various statements made by C.W. to M.A., the SANE, and the forensic interviewer. While the State did not declare in its opening that the case would amount to a "swearing match," it explained that the jury would hear "across all of those [witnesses] the consistency of [C.W.] when she recounted those events, and, yes, one last time [they were] going to hear it from her herself here in the courtroom." As in *Robisheaux*, many of the State's non-complainant witnesses served merely to corroborate C.W.'s statements. In its closing, the State summarized its case as, "If you believe [C.W.], [Denson] did it." Indeed, in his own closing, Denson emphasized the lack of evidence other than C.W.'s testimony and statements by asserting that the State was relying exclusively on the extraneous-offense evidence:

> [D]id [the State] start out that with their closing statement? He's done this before. This is the evidence you need right here. Of course our case is weak. It involved kids. There's not a lot of witnesses. There's not going to be a lot of evidence. Boy, that Officer Vasquez, he sure did a crummy job, but you don't need that. You've got this. He's done it before. That's it. That's all you need.

However, the argument points to precisely why the State's need for extraneous-offense evidence in child sexual cases is heightened and why propensity evidence is admissible in such cases.

Similarly, Denson's case, like Robisheaux's, rested principally on a defensive theory of fabrication. In his opening, Denson's attorney asked the jury to consider C.W.'s allegations in the context of, "[H]ow did this all happen, supposedly, in a tight, limited space when there were all these adults, all these kids, some feet away, some inches away? How did this behavior occur repeatedly and nobody else saw it, heard it, reported it?" He questioned Ellis and Melva about the lack of observed inappropriate behavior between Denson and C.W., asked

17

Ellis whether she believed C.W. to be truthful, and asked Melva about how C.W.'s life had improved since making the allegations. Although he stated repeatedly during his closing that C.W.'s credibility was not at issue, much of his argument appeared calculated to undermine that credibility. He suggested that Bratton had influenced the wording of C.W.'s outcry, stated that he saw a "scenario" in which C.W. had made the allegations to "get to [Bratton] and start leading that good life that she has now," noted that Ellis had testified that C.W. was untruthful, argued "there [was] no opportunity, credible opportunity, to commit this crime as alleged," and related a story in which he falsely remembered being attacked by a dog as a child, explaining, "I'm afraid of German Shepherds because of something that did not happen to me, but I still feel it. It is still real to me." As the State's attorney noted in rebuttal, "It was an awful lot of words to avoid saying that [C.W.] is lying."

Because there was minimal physical evidence and no eyewitness testimony, the State had to rebut the defensive theory of fabrication, and the State's ability to prove intent was complicated by the nature of the case, the State's need for the extraneous-offense evidence was considerable. *See Gaytan*, 331 S.W.3d at 227 (finding factor "weighs strongly in favor of admission" where, without extraneous-offense evidence, State's case would have "basically come down to [the complainant's] word against [the defendant's]," there was no physical evidence or eyewitness testimony supporting complainant's allegations, and several of State's witnesses "essentially simply repeated what [the complainant] had told them"); *Newton*, 301 S.W.3d at 320 (finding that trial court could have reasonably concluded that State's need for evidence was "considerable" because there were no corroborating eyewitnesses or physical evidence, and State had to rebut defensive theory of fabrication); *Price*, 594 S.W.3d at 681 (same); *see also Montgomery*, 810 S.W.2d at 381 (observing that due to "the inherent

18

circumstantial nature of the evidence tending to prove that appellant committed the charged offenses with the intent to sexually arouse himself" in case involving improper touching with hand, "[t]he manner appellant acted around his own children was the only proof of appellant's possible sexual motive if the touching did in fact occur"; noting that "it would have been reasonable for the trial court to conclude that the young girls would not be able to relate that appellant's touching their vaginal areas was done with the specific intent to cause his sexual arousal"; and acknowledging that "[w]ithout some evidence of appellant's motives, the possibility that any touching was done innocently exists as an outstanding hypotheses"). The second factor weighs strongly in favor of admission.

**Tendency of Evidence to Suggest Decision on an Improper Basis**

Evidence of Denson's prior conviction may have tended to suggest a decision on an improper basis because sexual misconduct involving children is inherently inflammatory and prejudicial. *See Gigliobianco*, 210 S.W.3d at 641 (stating that evidence might encourage decision on improper basis if it arouses jury's sympathy or hostility "without regard to the logical probative force of the evidence"); *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (recognizing that "sexually related bad acts and misconduct involving children are inherently inflammatory"); *Gaytan*, 331 S.W.3d at 227–28 (observing that extraneous-offense evidence had tendency to suggest verdict on improper basis "because of the inherently inflammatory and prejudicial nature of crimes of a sexual nature committed against children" (quoting *Newton*, 301 S.W.3d at 320)). Yet Rule 403 does not allow a trial court to exclude otherwise relevant evidence that is merely prejudicial; rather, the Rule protects defendants against *unfair* prejudice. *See Pawlak*, 420 S.W.3d at 811; *Wishert v. State*, 654 S.W.3d 317, 334

(Tex. App.—Eastland 2022, pet. ref'd). Moreover, potential prejudice may be mitigated if the extraneous act is no more serious than the allegation forming the basis for the indictment. *Robisheaux*, 483 S.W.3d at 220.

Although the basis for Denson's prior conviction is closely similar to that of the charged offense, the conviction involved indecent sexual contact with his son and was therefore likely more inflammatory. Accordingly, the third factor somewhat favors exclusion.

**Tendency of Evidence to Confuse or Distract Jury**

Confusion of the issues "refers to a tendency to confuse or distract the jury from the main issues in the case." *Gigliobianco*, 210 S.W.3d at 641 (citing S. Goode, et al., *Texas Practice: Guide to the Texas Rules of Evidence* § 403.2 at 165 (3d ed. 2002)). Misleading the jury "refers to a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds." *Id.* (citing Goode, et al., *Texas Practice: Guide to the Texas Rules of Evidence* § 403.2 at 164).

Testimony concerning Denson's prior conviction was straightforward, non-technical, and directly relevant to the jury's determination of guilt for the charged offense. *See* Tex. R. Evid. 401 (providing that evidence is relevant if it makes material fact more or less probable); *Robisheaux*, 483 S.W.3d at 220–21; *Gaytan*, 331 S.W.3d at 228. Although Denson argues that "[t]he jury would think that '[he] had done it before so he must have done it again,'" propensity evidence is admissible and probative under Section (2) of Article 38.37. *See* Tex. Code Crim. Proc. art. 38.37, § 2(b) (providing that evidence of separate child sexual offenses is admissible "for any bearing the evidence has on relevant matters, *including the character of the defendant and acts performed in conformity with the character of the defendant*") (emphasis

20

added); *Alvarez*, 491 S.W.3d at 371; *see Deggs*, 646 S.W.3d at 925. Moreover, the trial court mitigated any tendency of the extraneous-offense evidence to confuse or distract by instructing the jury that it should only find Denson guilty if it believed that the elements of the charged offense had been proven beyond a reasonable doubt and that it could only consider the evidence "in determining its bearing on relevant matters" if it found beyond a reasonable doubt that Denson had committed the prior offense. *See Deggs*, 646 S.W.3d at 926–27 (determining that trial court's instructions "mitigated the tendency of the extraneous-offense evidence to confuse or distract the jury from the main issue at trial" and "redirected the jury to the main issues in the case"). The jury is presumed to have followed the court's instructions. *Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003). For these reasons, the fourth factor weighs in favor of admission.

**Tendency of Evidence to Be Given Undue Weight by Jury**

This factor concerns "a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Gigliobianco*, 210 S.W.3d at 641 (internal citation omitted); *see Gaytan*, 331 S.W.3d at 228. Here, the evidence was not scientific or technical and pertained to matters including victim credibility that could be easily comprehended by laypeople. *See Gaytan*, 331 S.W.3d at 228; *Deggs*, 646 S.W.3d at 927. This factor weighs in favor of admission.

**Likelihood that Evidence Will Be Too Time-Consuming or Repetitive**

This factor concerns whether "the jury would be distracted from consideration of the charged offense." *State v. Mechler*, 153 S.W.3d 435, 441 (Tex. Crim. App. 2005). We

21

consider only time spent developing the evidence and exclude jury argument and hearings outside the presence of the jury. *See Dennis v. State*, 178 S.W.3d 172, 181 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

Although Denson is correct that multiple witnesses testified about his prior conviction, testimony concerning the extraneous offense only amounted to approximately 20 pages out of an approximately 479-page trial transcript. *Cf. Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (factor weighed in favor of admission where extraneous-offense testimony amounted to "less than one-fifth" of trial testimony). Moreover, the extraneous-offense testimony of Deputy Hughey, Ellis, and Melva was largely unrepetitive. Hughey testified about the contents of the conviction documents; Ellis testified that she was aware of Denson's conviction but chose to live in his house with her young children; and Melva testified that she was aware of the conviction and allegations, that she understood that the prior offense was "basically the same thing" charged in this case, that she had learned of the conviction from Denson's family and son, and that she was not "around for [the prior conviction]" and did not "participate in that process." This factor therefore weighs in favor of admission.

**Inability to Contextualize Evidence**

Although not one of the *Gigliobianco* factors, Denson argues that he was also prejudiced by his inability to "contextualize" his prior conviction. During the pretrial hearing on the extraneous-offense evidence, defense counsel explained that were the evidence to be admitted, Denson would be unable to get into the reasons for his probation revocation, why he

22

pleaded guilty, or purported "family testimonial evidence" that his son wished to recant following the trial. Similarly, counsel argued in closing:

> There's a lot more words here no one was going to explain to you, that this happened in 1998. He was placed on community supervision in 1999, but the judgment is from 2008. Do you have any explanation for any of that? No, you do not until I went to the fingerprint lady to try to explain to y'all what this was. In big, bad, tough Williamson County he committed this offense and got probation. Do we know why? We don't know. How did he do on probation? We don't know. What was his probation like? We don't know. Did they call a court officer to explain it, a probation officer, a clerk who works here for the government and can explain what all this means? No, they did not. They don't want to explain it because you don't need to know that stuff. Just focus on the nasty details. He's done this before, ladies and gentlemen. That's all you need to know in this case. Did they bring a witness from this era to talk about the details of this case? No, they did not. Sufficient to just pay no mind to that. It's just nasty from a go, and that should be enough evidence for y'all. You don't need more than that.

Denson does not assert—nor does the record indicate—that he was in any way prohibited from presenting evidence concerning his prior conviction. Although he states that to do so he would have had to waive his Fifth Amendment rights and testify, that decision was his to make. Moreover, the context that Denson states that he was prevented from developing does not appear to concern the admissibility of the extraneous-offense evidence under Rule 403 or *Gigliobianco*. He has offered no authority in support of the proposition that the State's failure to present certain testimony about an extraneous offense is prejudicial under the Rule. We find that his argument is without basis in law and is therefore without merit.

**Summary of Factors**

In summation, the first *Gigliobianco* factor is neutral or weighs at most somewhat in favor of exclusion; the second strongly favors admission; the third somewhat favors exclusion; and the fourth, fifth, and sixth weigh in favor of admission. Given our standard of review and

23

the Court of Criminal Appeals' warning to be cautious in excluding relevant evidence under Rule 403 in such cases, *see Hammer*, 296 S.W.3d at 568, we cannot say that the trial court abused its discretion by admitting evidence of Denson's prior conviction for indecency with a child by contact, *see Henley*, 493 S.W.3d at 82–83. His single issue is overruled.

## CONCLUSION

Having overruled Denson's sole issue on appeal, we affirm the trial court's judgment of conviction.

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Smith and Jones\*

Affirmed

Filed: May 12, 2023

Do Not Publish

\*Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).